The last case on for argument today is Woods v. Addiction Research. Mr. Hassan, are you going to argue first? Yes, Your Honor, unless you have a different preference. No, no, no, absolutely, that's fine. We'll wait a minute or two while the courtroom clears there. That way we can concentrate on what you all are going to be telling us. Just a couple, one more minute. Your audience has left you. I know. That's when you're going to last. Yes, Your Honor, the audience that matters is still here. Your Honor, my good morning. May it please the Court, my name is Mr. Abdul Hassan. I'm the counsel for Plaintiff Appellant Ms. Cassandra Woods. Your Honors, we maintain on behalf of Ms. Woods that the jury verdict and judgment of the district court should be set aside for the several reasons we put forward in the briefs. I know that the Department of Labor will also be addressing the butt for causation issue, so I would like to start with the sledgehammer that was used to smash my client several times during the trial, and that is the adverse inferences that were erroneously admitted into evidence. As set forth on page 21 of the brief, this report allowed adverse inferences to several questions that were posed to my client at the deposition. The adverse inferences, if you draw them, they amount to accusations and investigations of my client. It is well settled that mere accusations or investigations or even arrests are inadmissible to impeach credibility. That's not set forth just by the Supreme Court in the Mickelson case. It's set forth by this court in numerous opinions, including United States v. Leonardi. It's included in United States v. Sposato. It's also included in numerous district court decisions because this issue comes up a lot in the context of arrests. Accusations are so far off. People don't even try to get accusations by themselves to impeach them. Correct me if I'm wrong. This was an assertion of, or this was a refusal to testify, which was perfectly within our rights under the protections of the Fifth Amendment, right? That's correct, Your Honor. But like with other evidence, this court has held in Brinks and other cases, and the Ninth Circuit and every other court that has looked at the use of adverse inferences from invocation of the Fifth Amendment, that like every other piece of evidence, they must pass the test of admissibility, unfair prejudice, and so on. So there's no exception to the rules of evidence for invocations of the Fifth. To the extent that there is an exception, that exception should weigh in favor of people. Did she testify about the underlying conduct? No. In other words, she invoked the Fifth about whether she had been accused of these things. And did she testify about the alleged conduct in question? No, Your Honor. There was no testimony about— Was she asked about the alleged conduct in question? No, she was not. And I think that's a key point because the defendants probably knew that the inferences were a lot worse than reality, and they wanted to use the inferences and not get into the facts. So she was not asked, did you engage in that conduct at which point she pleaded the Fifth? No, she was not asked, did you engage in lying, stealing, cheating, whatever. She was asked, were you accused of lying? Were you accused? So you would agree—well, or maybe you wouldn't, but we'll put it that way—that if she were asked, did you engage in that conduct, and she took the Fifth, then the adverse inference could be drawn by the jury that, in fact, she did engage in that conduct. Yes, though— But they missed the boat in that regard. That's your argument. Yes, and maybe she would not have taken the Fifth. She would have said, no, I never did. Why did she take the Fifth on whether she had been accused? I mean, what is—I'm not sure that it was a proper invocation of the Fifth on whether she had been accused. It might be a proper invocation on whether she did the conduct. Yes, Your Honor, as to whether she was accused, I think when you decide to invoke the Fifth, you have to err on the side of caution. If there is an ongoing proceeding, you can't be that needed. Did you reserve your usual objections at this? In other words, you didn't waive an objection to whether that testimony would be admissible, that is, whether she was accused. No, Your Honor, we didn't waive any objections at all, and this is another critical point, because when you have questions that are asked in a deposition, as you know, the deposition, you can ask questions that seek inadmissible evidence at a deposition. Those questions will not be permitted at trial, so you have to— That's why I don't understand why the Fifth was invoked as to these questions. But in any event, she was convicted of something at some point? No, it was resolved as a disorderly conduct, a violation. Right, but was she convicted of a violation? Well, I guess it was a plea to a violation for disorderly conduct. All right, but that was a conviction, I gather. Yes, if you want to characterize— What was it? It's a violation? Violation. Not even a misdemeanor, not even a felony, not even anything to do with dishonesty, it was disorderly conduct. Was there an analysis done of whether this was admissible as a prior conviction? Well, it wouldn't pass as a prior conviction because it's disorderly— My question is whether there was discussion about whether it fit within Rule 609 of the Federal Rules of Evidence. No, because the defendants didn't want that. The defendants wanted the adverse inference because that was the damage. That was the hammer over the head. Look at the adverse inferences. They're pretty, pretty bad. And they were not only bad, they were strategically used. If you look at Judge Kerr's decision in Hines versus Coughlin and Judge Hall's decision in Abascal versus Fleckenstein, the damage here is a lot worse. This was not only used strategically throughout the case, and then the entire case turned on credibility. Defense counsel said, told the jury that these inferences are important because the plaintiff's entire case turns on credibility. And what he was saying to the jury is if you believe her, she wins. If you believe us, we win. So the entire thing revolved around credibility. And they used it strategically in the opening statements during cross-examinations. It was the subject of jury instructions. And they'd use it in closing arguments. And moreover, we were . . . The district court performed a 403 balancing analysis. I think there might have been some discussion of 403 analysis, Your Honor. But our point is that if this is not admissible to impeach credibility, which was why it was admitted, you don't even get the 403. I understand you're arguing that. My question was on the 403. For once the district court decided that it was admissible, that's not the end of the discussion. Yes, Your Honor. And so you have here that it's settled that these accusations are inadmissible to impeach credibility, and the harm cannot be disputed. The district court itself made a finding after the trial that one of the reasons to justify the jury verdict is because of these adverse inferences. Look at the record at A. 955 to 956. So you have the judge saying it was critical to the jury's decision. You have defense counsel telling the jury that this is important for them to reach a decision. And then you have the strategic use throughout the trial of this evidence as to the most important and critical issue, the credibility of the plaintiff in terms of who to believe. Your Honor, I see my time is up. Yes. You've reserved three minutes for rebuttal, Mr. Hassan. So thank you. Ms. Goldberg. Please, the court. My name is Rachel Goldberg. I apologize. My voice sounds very odd. Would you like some water? I might bring my water up, if that's OK. On the tail end of a cold, and it's that cough stage. I represent the Secretary of Labor. We're appearing as amicus in support of plaintiff appellant. And we're here strictly on the FMLA mixed motive question, whether a mixed motive analysis is available under the FMLA. And I'd like to start with- With respect to both interference and retaliation. Well, it really comes into play in retaliation claims. But retaliation claims, retaliation for exercising your FMLA rights, really falls under the statutory prohibition against interference. So in a way, that leads right into what I wanted to start with, which is the courts uniformly recognize that the FMLA has to protect against retaliation for exercising your FMLA rights. That's essential to the functioning of the statute. But the statute is ambiguous. It does contain a gap in that it doesn't expressly prohibit that type of retaliation. So ambiguous or silent? Well, it's ambiguous because it's silent. I mean, I think there's a clear gap there. If you look at the language in A2, it's clearly that is prohibiting retaliation for opposing an unlawful conduct. And when an employee takes FMLA leave and is retaliated against for doing that, they haven't opposed anything. So it doesn't fall under A2. But the broad prohibition against interference with an employee's FMLA rights in A1 does encompass that kind of retaliation. And that's what we have said in our regulation at 825-220, which we had congressional authority. Does it focus on A1 or A2, or both, or does it? I mean, the language is different in the two. Does it matter? Well, it matters now because of Gross and Nassar, frankly, which instruct courts to look to the language of the statute to determine what type of retaliation is prohibited and what causation is required. And here, when you look to the language of the FMLA, you see, first of all, that this type of retaliation isn't even expressly included. It does prohibit interference. And, importantly, the statute here also gives the department authority to promulgate rules to enact the statute, to administer the statute. So given that, the department then promulgated a rule. Trying to ascertain whether there is ambiguity, which words are we looking at? I mean, are we looking at the words of one, or of two, or of both? Well, I guess I think it's actually truly more of a gap in that it's not that the A2, I don't think, is ambiguous, per se. A1 interference could be seen as ambiguous in that what does interference mean exactly? What is encompassed within that? And there's clearly a gap in that the type of retaliation that we're talking about for exercising your FMLA rights is not included. And it has to be. Neither section has because. I'm sorry, what's that? Neither section has the because of language. No, but we do acknowledge that A2 has for language, which some courts have found to be required, but for causation. But in any event, that's not the applicable provision. A1, the interference provision, is the applicable provision. And I'd like to. So do we give Chevron deference? Or generally speaking, are there cases out there that say you give Chevron deference to regulations that fill gaps, as opposed to clarify ambiguities? Yes, Chevron deference is for ambiguities, certainly. But yes, also for gap filling. And to me, this is a quintessential gap filling because this kind of retaliation has to be prohibited. It's essential to the functioning of the FMLA. And for that reason, because it's in our regulation and our regulation also makes clear that FMLA leave cannot be considered as a negative factor in an employment decision, that this case is not like Gross and Nassar, where the statutory language clearly compelled a but-for causation standard. Here, you don't have that kind of statutory language. You have a gap. You have congressional authorization to engage in rulemaking, which we have done. And it's consistent with the policy of the FMLA, which is to give employees the ability to take FMLA leave and have their job be protected, have job security. And if an employee, I'm sorry, if an employer can take their FMLA leave into account, it's motivating them to impose an adverse action on that employee, well, that's clearly undermining the employee's leave entitlement, which is the essential function of the FMLA, which is to provide job-protected leave. Do we have to reach this issue if we determine that on the facts that the jury had before it, she was dischargeable? Well, as some courts have done, you could say, well, under either standard, what fails or doesn't fail. I would note there are courts, district courts, have gone in many different directions. We clearly need appellate guidance on this. Of our district courts here. Exactly. We are sorely in need of clear guidance on this issue. Even if it's dictum? Well, I don't think it needs to be dictum, but I'll leave it at that. Thank you. Thank you, Ms. Goldberg. Thank you for being here today. Paul, good morning. Good morning, Your Honor. May it please the court, my name is David Pohl, and I represent the Appellee Start Treatment and Recovery Centers. I want to discuss the Nassar point for sure, and I want to discuss what happened at trial, because I think overall, that's the most important thing here today. But I want to start with Mr. Hassan's point about the Fifth Amendment. It's presented as if these were mere accusations. That is simply not true. Wait, wait, wait. The questions were, were you accused of? Repeatedly, it was were you accused of these things? And even if the answer is yes, what's the probative value of an accusation? Understood, Your Honor. Were it mere accusations, you'd be entirely correct. But another question was, and in connection with this, were you convicted of any immoral or unethical conduct? So my view. Is that trying to impeach with a conviction? Well, that's partially yes. Would you not have to look at Rule 609 of the Federal Rules of Evidence on the use of prior convictions? And Your Honor, I did raise that below. That was one of my points, Mr. Hassan. Was there a discussion or a finding by the trial court that this met the requirements of Rule 609? Your Honor, it was not argued. It was not discussed. I briefed it in my brief. It's at ECF Doc Number 74. If it wasn't argued or discussed or ruled upon, why wasn't that error? Well, Your Honor, because I believe not only was it admissible as non-hearsay because of the conviction, but I believe also this court has the power within the context of a harmless error review to say, well, it was. As Judge Kearse asked, did the court engage in a 403 waning? Again, I briefed it. What were the value of these things versus the risk of substantial unfair prejudice? I briefed the issue, Your Honor, pointing out that there may be prejudice, but it's not unfair. Did the court engage in the analysis? There was not a discussion of it on the record, no. Is that a problem now? I don't believe it is whatsoever, Your Honor. And here's why I believe that. Not a problem whatsoever? Well, no, no. The reason is, even if Mr. Hassan is trying to paint the picture as if this entire case came down to Fifth Amendment invocations, and that could not be further from the truth. Yes? Now you're making a harmless error analysis, but are you conceding that there was error? No, I'm not. I am absolutely not. I believe this came in appropriately under a typical 403 analysis, which I briefed and the court ruled on, as well as 609. Did the court rule on the 403? Well, no. Did the court do a waning? I find that. No, not on the record, Judge. Not on the record. I am getting to the harmless error point, because I think that may be a more fruitful use of our time here. The suggestion that Ms. Woods was done in by the Fifth Amendment invocations is not based in reality. This jury witnessed Ms. Woods get caught in lies no less than five times. I caught her in five lies. So I even told the jury. Mr. Hassan makes it sound as if on summation, I just said Fifth Amendment, Fifth Amendment over and over again. It's quite the opposite. I told the jury, quote, I'm not hanging my hat on the Fifth Amendment invocation. And I said to the jury, I demonstrated that she has lied in this case. That's more important. She's lied in this case. So those lies that she told, that's what did her in. These Fifth Amendment invocations merely corroborated what the jury saw in front of it. I'm looking at pages A631 and 632, which is your summation. And it certainly looks to me like you are relying very heavily on the inferences. Well, Your Honor, I believe that's exactly where I say I'm not hanging my hat on these inferences. And that comes after a very long, I gave a very long-winded summation, I admit. And in that long-winded summation, I went through all the lies in this case. The jury heard her lie about facts in this case. So I was attempting to downplay the Fifth Amendment by saying, I don't need to hang my hat on that. That's my quote. I want you to look at the lies in this case. So now, if Your Honor, if you don't mind, I'd like to get to what those were. And I think a good place to start would be what happened here at this trial. She claims she was fired for taking FMLA leave. Start put on four witnesses, credible witnesses, who testified in no uncertain terms that Ms. Woods was fired solely for performance problems after countless second chances. There was no other cause. It wasn't even considered. That is undisputed, uncross-examined testimony from witnesses. The jury heard unrebutted, uncross-examined testimony of her performance issues. The jury saw 12 written contemporaneous memos over a year-long period detailing these issues. The jury had them, and I urged the panel to review them. They go through in detail the missed deadlines, the extension she was given. Start worked with her for over a year. She was given a raise in hopes it would motivate her. But after that, her performance slipped to the point where she had a 28% completion rate. She was the lowest performing counselor at her clinic. Her colleagues were up at around 90 or 95%. Again, this is unrefuted, undisputed testimony that she was the worst performing counselor at the clinic. Dr. Sage, who was not her immediate supervisor, but a supervisor, told the jurors how 15% of other employees, 15% of her colleagues were terminated for the same reason and after the same process. He also testified, quote, there was no other reason to terminate her. So this has nothing to do with FMLA or any medical issue that was occurring at that time. She was terminated for performance issues. This was the cause. That testimony was not even challenged, not cross-examined. It's undisputed that if she just would have caught up with her work by May 17th, she just would have caught up substantially, not even entirely, but just gotten close, that she would not have been fired. All of her supervisors said that. If she would have caught up, she wouldn't have been fired. So FMLA leave, there's no evidence. She failed to induce any evidence that it was even considered as a factor. Now, let's get to the lies that she told the jury in which she was caught. Number one, she lied about an alleged March 2012 denial of FMLA leave. I impeached her testimony on that, and this is all in the brief, so I'm not gonna go into all the details. I impeached her testimony with her prior deposition and her complaint, which showed that this whole story was impossible as a matter of physics. It couldn't happen. Number two, she lied about a February 2011 incident where she said she was discouraged from taking leave. Again, I impeached her in front of the jury with her prior inconsistent deposition testimony, and she was forced to admit to the jury that testimony she just gave wasn't accurate. This all happened right in front of the jury. Number three, she lied about her belief in her own claims. At her pretrial deposition, she admitted that she was not even sure whether she still believed she was fired for taking FMLA leave and not for her documentation problems. At trial, she denied making that admission. So I showed the jury her deposition testimony where she clearly did make that admission. This wasn't even difficult for me pointing out these inconsistencies, and the jury witnessed it. Number four, she lied about a particular credential being a job requirement, the CASAC, C-A-S-A-C, Certified Alcohol Substance Abuse Counselor. At her pretrial deposition, she admitted that obtaining it was a job, she admitted being told that it was a job requirement, and in fact it was, and she could have been fired for only that reason. Stark didn't name that as a reason because this was not something that was high on the list. Her performance problems were much higher, but this was a fireable offense. At trial, she tried to claim it was not a requirement, and so I impeached her with her admission from her deposition where she acknowledged that it was. And also, the jury saw numerous memos that she received over a year saying, you have to get the CASAC. If you don't, you could be terminated, and she never got it. Number five, she lied to the jury about a conversation she claims to have had with her supervisor on April 30th, 2012, in which after she came home from, excuse me, back to work from a five-day FMLA leave, she says he told her, oh, don't do any more work, you're gonna be fired, it's over. I showed her, well, this is something she didn't bring up in her deposition at all, and so I impeached her by omission, and the jury was left to conclude that she had made this whole story up for trial, and in fact, that's exactly what happened. And so, these were not factual disputes the way Mr. Hassan is characterizing them. These were just lies, and she got caught five times. So her credibility was absolutely decimated in this trial, no doubt about it, but she did it to herself. She did it by getting caught lying five times. The Fifth Amendment stuff, it merely corroborated what the jury saw right in front of it, that this is a witness who has a hard time with the truth. So the idea that this was the hammer that did her in, that is absolutely not true. I say the same thing to you that I say to the jury, I am not hanging my hat on the Fifth Amendment invocation. So, can I answer any more questions about the Fifth Amendment? Maybe, but go ahead and tell us about why the but-for jury charge, or the absence of the but-for jury charge is not a problem. Okay, so, I'm sorry, your question, why the absence of the but-for, so the court instructed on but-for copy. Yeah, sorry, right. And you're asking why that was appropriate? I'm not trying to trick you. I felt tricked. I just spoke. Okay, okay, so, Nasser is clear. Congress incorporates but-for causation in any claim, any federal statutory claim of workplace discrimination, absent an indication to the contrary in the statute itself. It's that simple. That's. Do you agree that there's some ambiguity in the statute? Absolutely not. Absolutely not. Section A-2 bars retaliation for opposing any practice made unlawful. Section B bars retaliation because an individual participated in an FMLA proceeding. There's only, let me start somewhere else. This court has acknowledged, as have nearly every other court of appeals, that FMLA retaliation claims, asserting that someone was retaliated against for taking leave, they arise under A-2 or A-2 or B. Now, clearly, it's being inferred. The courts are inferring that this cause of action arises under that provision. The Sixth Circuit stated clearly. The structure of the FMLA itself and its legislative history strongly support interpreting section 2615 A-2 as prohibiting retaliation against employees who use FMLA leave. This court, in the Malia decision, which I quote in my papers, expressly identified section A-2 as, quote, the FMLA's anti-retaliation provision. It has the same underlying purpose as Title VII and almost identical. Why wouldn't A-1 also pick up retaliation? Well, uh... Because retaliation would be an interference. Well, you could certainly take that view, and I would say that even if you do, Nassar is still clear that absent an indication in section A-1, absent an indication to the contrary, but for causation applied. To interfere, I think, is a broader concept. Well, Your Honor, I believe that what the DOL is doing here is arguing that the FMLA's clear retaliation provision, which every court of appeals... I don't know it's so clear. It says it's entitled discrimination. It doesn't... It's not entitled retaliation. Well, every court of appeals, including this one, has identified section A-2 as the FMLA's retaliation provision. And so I agree with you that the language may not be crystal clear, but courts are in agreement on that. Yes, the DOL is correct. There is some language where courts also say that A-1 could have an impact here, but every court, including this one, has inferred it under A-2 or A-2 and section B. And I would say, to say that FMLA retaliation claims arise under A-1 puts... It creates an arbitrary distinction here in terms of what causation standard would be applied. I guess it wouldn't matter which one you were under unless you were to conclude that one is but-for and the other is motivating factor. Then it would matter. That's correct. But I have briefed in my papers, and there's a Tenth Circuit case that invalidated an FMLA provision for drawing an arbitrary distinction between claims where it wasn't warranted. That would be a purely arbitrary distinction. So a plaintiff comes into court and argues that they were retaliated against for participating in an FMLA proceeding, and it's but-for, which Nassar clearly requires. The language is because, and there's no motivating factor standard in B. But then a plaintiff comes in and says that they were fired for taking FMLA leave, and that's motivating factor. These are that there is no reasoned analysis for that distinction. And this court's jurisprudence, I cited in my papers, requires the DOL to have a reasoned analysis for why that distinction makes sense. There is no reasoned analysis. You won't hear one. And the reason is that there is no reason behind that distinction. It's arbitrary. The DOL is attempting to create confusion here. They're attempting to ignore the express retaliation provisions, saying that it all falls under the interference provision because that creates some kind of confusion and ambiguity, and that's what gets you Chevron deference. But after Nassar, the crystal clear statement that absence and indication to the contrary in the statute itself, the claim requires but-for causation. In light of that, there is no ambiguity here. This is crystal clear. And I should say, the Sixth Circuit, this is very important here, the DOL points out a Sixth Circuit case from 2009 in which the court upheld this regulation. They simply applied Chevron deference. In my papers, I point out that that Sixth Circuit decision cannot possibly still apply after, or can't be valid after Nassar's default rules. And in fact, after my brief was submitted, December 28th, 2016, the Sixth Circuit appears to have concluded the same in Sharpe v. Profitt. Quote, it seems that FMLA retaliation requires a showing of but-for causation. And so the Sixth Circuit, the very circuit that the DOL has been relying on, has now come around and said that it's pre-Nassar decision can no longer stand. I see that my light is on, and so happy to answer anything else. Thank you, Mr. Paul. Mr. Hassan, you have reserved three minutes for... Yes, Your Honor. Your Honor, Defense Counsel's recitation of the litany of factual disputes highlights precisely why the erroneous admission of these inferences were harmful. I addressed almost all of them, or all of them in my brief. But pay attention to what Counsel said about the witnesses. When he said all the witnesses testified that the plaintiff would not have been fired if she had met the deadline, or even caught up on the April 18th memorandum. All the performance problems here, there, and everywhere it came down to the April 18th memorandum. That was the responsibility she was charged with completing by May 2nd. And all of the defense witnesses testified at trial, if she had met the deadline, or even caught up, not even meet the deadline, but caught up, she would not have been fired for performance reasons. But what do you know? For half the deadline period, she was on protected FMLA leave. And as we also pointed out in our brief, she was entitled to a reasonable extension, not just an extension equal to the time that she was out on leave. If you look at the regulation of 29th. Why is that unreasonable? Say what, Your Honor? Why is that extension unreasonable? Well, the jury didn't get to make a determination whether it was reasonable or not. And let me tell you why a longer extension may be reasonable in this case. When you come back to work, especially from an illness, a lot of times you need time to reintegrate. The conditions may not be the same. Someone else might be doing your work. You may not have a desk, you may not have an office. You may need, the momentum that you had previously was usually broken by the absence or the illness. So that's why the regulations, 29 CFR 825.215B, say a reasonable extension to take account for the circumstances in the case, as opposed to just- How long was that leave? The leave was seven days. She was out for seven days, Your Honor. And how long did she have after she got back to catch up with her evaluations? Well, she testified that on the first day back when she saw her, the Monday after the leave, her supervisor told her that he was not going to extend the deadline, and that basically it was over for her. By the way, the supervisor gave this testimony in his deposition. Look at- Let me ask you something. She was only out for seven days? Yes, Your Honor. She collapsed and she had a blood transfusion and she- She had, as I understand it, she had eight patients unseen for February, 39 patients unseen for March, 49 patients unseen for April. Could that all have been the result of being out for seven days? No, Your Honor, but remember, in the April 18 memorandum, they gave her certain tasks to complete by May 2nd, which they felt she could finish by May 2nd, and she couldn't finish them because for half that time she was- You're arguing there was lots of evidence in the record that she was just unable to do the job, apart from the FMLA leave. So, I mean, what evidence is there that she was, that her rights were interfered with or that she was retaliated against because she took FMLA leave? Because they did not extend the deadline for her to complete the two-week assignment that she was given, which is the last straw that broke the camel's back at the end. And that's a factual dispute. And that dispute, in fact, the supervisor himself testified in the deposition that he never extended the deadline, then he switched to testimony trial. Your Honor, can I just say one quick thing on the Budford causation? The Budford causation, to me, is a fairly simple, even though complicated one in some respects. The Supreme Court in Nassau, when it was presented with the agency interpretation, what did it do? It performed deference analysis. Now, in that case, it found that the requirements for skid more deference weren't satisfied. But in this case, counsel wants you to just apply some magical default rule and ignore the deference analysis or to skip the second step of it. Follow the high court in Nassau, perform the deference analysis. Here, both sides agree the Chevron applies on the Chevron to invalidate the regulation is almost unheard of. Here, this is a reasonable filling of the gap. Remember, in 1993, when this law was passed, almost all of the law was just delegated to the agency to fill the gap, also because of a compromise to get the law passed. 90% of the FMLA consists of regulations by the DOL. Your Honor, thank you, and I urge you to vacate the verdict and judgment of the district court. Thank you. Thank you, Mr. Hassan, Ms. Goldberg, Mr. Paul. We'll reserve decision. The final case being on submission, I'll ask the clerk, please, to adjourn court. Court is adjourned.